

# In the
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

---

No. 06-25-00062-CR

---

STEPHEN ALAN KING, Appellant

V.

THE STATE OF TEXAS, Appellee

---

On Appeal from the 271st District Court
Wise County, Texas
Trial Court No. CR25052

---

Before Stevens, C.J., van Cleef and Rambin, JJ.
Memorandum Opinion by Justice Rambin

A Wise County[1] jury convicted Stephen Alan King of the first-degree felony offense of knowingly causing serious bodily injury by omission to a child, his 28-month-old daughter, Ava.[2] *See* TEX. PENAL CODE ANN. § 22.04(e) (Supp.). The jury assessed King's punishment as twenty years' imprisonment. The trial court entered judgment on that verdict. In his sole point of error on appeal, King argues that the evidence is insufficient to support the jury's verdict because the evidence fails to establish that he acted knowingly in the commission of this offense. Because we find that the evidence supports the jury's verdict, we affirm the trial court's judgment.

## I. Standard of Review and Applicable Law

"The due process guarantee of the Fourteenth Amendment requires that a conviction be supported by legally sufficient evidence." *Braughton v. State*, 569 S.W.3d 592, 607 (Tex. Crim. App. 2018) (citing *Jackson v. Virginia*, 443 U.S. 307, 315–16 (1979)). "We assess legal sufficiency by viewing the evidence in the light most favorable to the verdict and asking whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Bittick v. State*, 707 S.W.3d 366, 368 (Tex. Crim. App. 2024) (citing

---

[1]This appeal was transferred to this Court from the Second Court of Appeals pursuant to a Texas Supreme Court docket equalization order. *See* TEX. GOV'T CODE ANN. § 73.001 (Supp.). Accordingly, we apply the precedent of the Second Court of Appeals in deciding this case to the extent that it conflicts with our own. *See* TEX. R. APP. P. 41.3.

[2]We use pseudonyms to protect the identities of the children. *See* TEX. CONST. art. I, § 30(a)(1) (conferring crime victims with "the right to be treated with fairness and with respect for the victim's dignity and privacy throughout the criminal justice process"); TEX. R. APP. P. 9.10(a)(3); *McClendon v. State*, 643 S.W.2d 936, 936 n.1 (Tex. Crim. App. [Panel Op.] 1982).

*Jackson*, 443 U.S. at 319). "We compare the trial evidence to 'the elements of the offense as defined by a hypothetically correct jury charge for the case.'" *Id.* at 369 (quoting *Zuniga v. State*, 551 S.W.3d 729, 733 (Tex. Crim. App. 2018)). A hypothetically correct jury charge "accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability and adequately describes the particular offense for which the defendant was tried." *Johnson v. State*, 364 S.W.3d 292, 294 (Tex. Crim. App. 2012) (quoting *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997)).

"This familiar standard [of review] 'recognizes the trier of fact's role as the sole judge of the weight and credibility of the evidence after drawing reasonable inferences from the evidence.'" *Braughton*, 569 S.W.3d at 608 (quoting *Adames v. State*, 353 S.W.3d 854, 860 (Tex. Crim. App. 2011)). "On review, this Court determines whether the necessary inferences made by the trier of fact are reasonable, based upon the cumulative force of the evidence." *Id.* (quoting *Adames*, 353 S.W.3d at 860). "We presume that the factfinder resolved any conflicting inferences in favor of the verdict, and we defer to that resolution." *Id.* "As a reviewing court, we may not reevaluate the weight and credibility of the evidence in the record and thereby substitute our own judgment for that of the factfinder." *Id.* "A reviewing court is thus 'required to defer to the jury's credibility and weight determinations.'" *Id.* (quoting *Brooks v. State*, 323 S.W.3d 893, 899 (Tex. Crim. App. 2010)). "However, juries are not permitted to come to conclusions based on 'mere speculation or factually unsupported inferences or presumptions.'" *Id.* (quoting *Hooper v. State*, 214 S.W.3d 9, 15 (Tex. Crim. App. 2007)).

"In reviewing the sufficiency of the evidence, we should look at '"events occurring before, during and after the commission of the offense and may rely on actions of the defendant which show an understanding and common design to do the prohibited act."'" *Hammack v. State*, 622 S.W.3d 910, 914 (Tex. Crim. App. 2021) (quoting *Hooper*, 214 S.W.3d at 13). "Each fact need not point directly and independently to the guilt of a defendant, as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction." *Walker v. State*, 594 S.W.3d 330, 335 (Tex. Crim. App. 2020) (citing *Hooper*, 214 S.W.3d at 13). "Direct evidence and circumstantial evidence are equally probative, and circumstantial evidence alone may be sufficient to uphold a conviction so long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction." *Ramsey v. State*, 473 S.W.3d 805, 809 (Tex. Crim. App. 2015). Further, we "consider all of the admitted evidence, regardless of whether it was properly admitted." *Stahmann v. State*, 602 S.W.3d 573, 577 (Tex. Crim. App. 2020) (citing *Jackson*, 443 U.S. at 319).

Here, King was charged with "knowingly, by omission, caus[ing] serious bodily injury to [Ava] . . . by failing to provide adequate food and water." Relevant here, "[a] person commits an offense if he . . . knowingly, . . . by omission, causes to a child . . . serious bodily injury." TEX. PENAL CODE ANN. § 22.04(a)(1) (Supp.). "A person acts knowingly, or with knowledge, with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result." TEX. PENAL CODE ANN. § 6.03(b).

4

## II.      The Evidence at Trial

Eric Debus, who was the chief of police for the Rhome Police Department, testified that he was called to the home of a deceased child on April 26, 2023, at approximately 3:11 p.m. Debus said he arrived at the home and entered the main living area, which had a kitchen to the left and the master bedroom to the right.

When he entered the home, Debus first found another officer holding Ava's younger brother, Dustin. Debus then found medics evaluating Ava in the master bedroom. Debus said, "[T]here was no bringing the child back," and he asked the medics to stop their interventions in order to maintain the integrity of the scene. Debus said that King "was there and [was] very distraught."

Debus testified that the home was "[v]ery unkempt" and "not maintained at all," with "[d]ebris, toys, things just everywhere." Debus said, "It was difficult to walk through the house without stepping on things or without lifting your feet up to keep from kicking things," but Debus said there was no odor or indication of drugs in the home. Debus testified that there was a case of bottled water on the kitchen floor, Whataburger cups sitting next to the bed in the master bedroom, and a muffin on the bed.

Debus saw a dog chained to a tree to the left of the front door with no water or food. He fed the dog with dog food from inside the house and said that the dog "responded as if it [had not] had food or water in a long time," and "it was very skinny."

The Texas Rangers were called in to investigate, and Ranger Job Espinoza, one of the lead investigators, testified at trial. Espinoza arrived at the scene the afternoon of Ava's death.

5

Espinoza said that King's home was very dirty, with signs of "overall neglect and dirty diapers all over the place." Espinoza testified that the home smelled of rotten food, urine, and feces. He said that he saw a Whataburger sack, peanut butter, a muffin, and doughnuts in the master bedroom. Espinoza testified King later told him that King had gotten the muffins for Dustin that morning. Espinoza also saw feces rubbed on Ava's crib and on the wall near her crib. Espinoza testified that King later told him that Ava had reached in her diaper and put feces on the wall and on her crib.

Espinoza testified that he interviewed King sometime later in the day of Ava's death because King was too distraught at the time of her death to answer coherently. Espinoza testified that when he interviewed King, King said that he put Ava and Dustin to bed at approximately 8:00 p.m. on April 25. Espinoza stated that King told him Ava was fussy, so he got her out of bed and let the children watch a movie. Espinoza testified that King said he then put the children back to bed between 11:30 p.m. and midnight. King told Espinoza that Mother came home around midnight and slept, then awoke to go to work early the next morning. Espinoza testified that King told him that he checked on the children when Mother left for work, but they appeared to be sleeping, so he went back to sleep.

When Dustin awoke King at 2:30–2:45 p.m., King retrieved Dustin from his crib in his bedroom and then went to check on Ava in her crib in her bedroom. Espinoza testified that King told him he found Ava unresponsive, not breathing, and stiff. Espinoza stated that King told him he knew Ava was deceased. Espinoza testified that King stated he then took Ava to his bedroom, placed her on his bed, and called 9-1-1. It was about 3:01 p.m. on April 26, 2023.

6

Espinoza said a fireman at the scene gave Dustin a bottle of formula, but Dustin later threw up quite a bit. Dustin was evaluated at a hospital that day but was released to Mother and her mother that night. A more thorough evaluation of Dustin was later requested, and Dustin was admitted to Cook Children's Medical Center, where he stayed for about two weeks.

Espinoza said that King, Mother, and Dustin all appeared to be sick on the day of Ava's death, as they were coughing, congested, and had runny noses. Espinoza said that Mother was very skinny and that Ava and Dustin looked malnourished and skinny.

Espinoza's investigation indicated that Mother did not have any interaction with the children for a couple of days prior to Ava's death due to her work schedule. Although she had returned home around midnight the night before Ava's death, she got up and left for work early the next morning without checking on the children.

Espinoza testified that he determined, based on King's timeline, that Ava had been in her crib for approximately fifteen hours when King found her. Espinoza said that he was told Ava could not get out of the crib on her own. King did not give the children formula or food or change their diapers during the fifteen hours they remained in their cribs.

Dr. Stephen Lenfest, medical examiner at the Dallas County Medical Examiner's Office at the Southwestern Institute of Forensic Sciences, testified about the autopsy he performed on Ava. Lenfest testified that Ava's eyes were recessed into her eye sockets, a condition usually seen in someone who is malnourished or dehydrated. There was a degree of temporal wasting, meaning "the area of the scalp above her ears and on the side of the forehead [were] just thinner than it ought to be." The temporal wasting also indicated malnutrition.

7

Lenfest testified that Ava's diaper was saturated with urine and contained feces. Ava had diaper rash, which Lenfest testified was indicative of her diapers being left on for too long. Lenfest described Ava's buttocks as having "very superficial" ulcerations that were due to prolonged exposure to fecal material rather than being pressure ulcers caused by being in one position for too long. Lenfest determined that Ava had lost "skin turgor," which indicates dehydration because the skin loses elasticity and will "tent" when pulled up due to a lack of moisture rather than returning to its normal position.

Lenfest testified that some of Ava's organs had a moist appearance, as they should, but others did not glisten as much and instead were sticky or tacky, which indicated dehydration. Lenfest observed a small amount of fluid in Ava's lungs and some bronchi, along with inflammation, which was likely caused by mild bronchitis.

Lenfest said Ava's toxicology report showed the presence of acetone, which indicated she was malnourished, as her body was breaking down fat because it did not have enough carbohydrates and glucose to produce energy. Ava also had elevated levels of sodium, chloride, creatine, and urea nitrogen, which all indicate kidney dysfunction and hypernatremia dehydration.[3] Lenfest testified that Ava had acute kidney injury. Ava also tested positive for rhinovirus and enterovirus, which he described as being associated with the common cold and causing upper respiratory and gastrointestinal symptoms. Lenfest testified that Ava probably had a mild upper-respiratory infection.

---

[3]Dr. Kristen Reeder, an assistant professor of pediatrics in the Department of Pediatrics at the University of Texas (UT) Southwestern Medical School and a board-certified child-abuse pediatrician at UT Southwestern Children's Medical Center in Dallas, the State's second expert, described hypernatremic dehydration as the "loss of water from the body that causes an increase in the concentration of sodium."

Lenfest said Ava had nothing in her stomach and a very small amount of urine in her bladder. He testified that she had fecal material in her small and large intestines, which indicates she did have food and nutrition, but he opined that whatever nutrition she had received was not enough. Lenfest testified that Ava was twenty-one pounds and thirty-four inches in length at the time of her autopsy, which put her below the third percentile for her weight and between the fifteenth and twenty-fifth percentile for her height. Lenfest stated that because he did not have Ava's baseline information, he did not know whether her growth had been consistent.

Lenfest concluded that Ava's cause of death was due to "complications of neglect, including malnutrition and hypernatremic dehydration." Lenfest noted Ava's manner of death as homicide.

Lenfest said that rhinovirus and enterovirus would not be expected to cause death by themselves, but Ava was already in a fragile condition due to malnutrition and dehydration, so a common cold was more significant to her health than it would have been to a healthy child. While Lenfest stated that the complications of neglect, including malnutrition and dehydration, were the primary causes of Ava's death, the rhinovirus and enterovirus "probably did contribute" to her death. When asked whether he could rule out bronchitis, enterovirus, or rhinovirus as Ava's cause(s) of death, Lenfest said his opinion and his autopsy report show that he did rule those contributing factors out. When questioned whether Ava's illness was clearly sufficient to cause her death and whether the malnutrition and dehydration were clearly insufficient to do so, Lenfest responded, "I don't think so."

9

Reeder (who, as noted above, is a board-certified child-abuse pediatrician at UT Southwestern Children's Medical Center in Dallas) reviewed Ava's and Dustin's medical records at the request of the Department of Family and Protective Services. Reeder testified that Ava was in the seventh percentile of weight when she was born. At her two-week and two-month visits, Ava was gaining weight, and there were no concerns. Just after Ava turned four months old, Mother called Ava's pediatrician and said that Ava was spitting up half of her formula. At her six-month visit, Ava's weight was in the fifteenth percentile. At her nine-month well-child visit, when Ava was ten months old, King reported that Ava was eating more solid foods but was only drinking two bottles of formula per day. King was told to increase Ava's bottle intake to four bottles per day. At that appointment, Ava had lost weight.

Ava was taken in for a weight check when she was eleven months old. Ava was reportedly taking three to four bottles per day, and her parents were adding calories to foods to increase her caloric intake. Ava had gained a small amount of weight. King and Mother were told to continue fortifying Ava's formula by mixing higher calorie concentrations.

Although Ava had a twelve-month well-child visit scheduled, she was not seen for six more months. Ava was seventeen months old at that time. Her pediatrician noted that Ava had a diaper rash and was thin for her age. The pediatrician recommended giving Ava PediaSure twice daily in addition to increasing the calories of her food. Although Ava had an eighteen-month well-child visit scheduled and should have been seen for a twenty-four-month well-child checkup, she was never seen again by her pediatrician.

10

Reeder's medical assessment notes that the six-month well-child visit was the last appointment Mother attended, and after that, King brought Ava in for her visits. Reeder notes that Ava was seen regularly until her nine-month well-child checkup, "at which point she had fallen below the growth curve for weight." At the time of her death, Ava weighed twenty-one pounds. Reeder stated that Ava should have been twenty-four pounds by then. Reeder based that opinion on Ava's previous growth history and where she should have been on her growth curve.

Reeder testified as to the findings in Lenfest's autopsy. She concluded that she had no reason to disagree with Lenfest's determination of Ava's cause and manner of death, although, unlike Lenfest, Reeder believed the skin breakdown on Ava's buttocks was pressure ulcers, which occur from sitting in one place or position for a prolonged period.

Reeder testified that a typical twenty-eight-month-old child would act on hunger and thirst cues to get food and water any way they could. She stated that the history that she was given of Ava's last hours and days did "not match[] objectively the information in her autopsy." Reeder stated that a child in Ava's condition, a few days before his or her death, "would not have been a child that was normal and then died." In "the hours before her death, [Ava] would have been very weak, . . . very fussy or irritable." She would have been hungry, thirsty, not feeling well, perhaps having seizures, unresponsive, and inactive, and would have acted abnormally. Reeder testified, "This would not have been a normal child in the last several days of her life." Based on her experience and training, Reeder opined that Ava's appearance would have prompted a reasonable caregiver to provide Ava with medical treatment, food, and/or water.

11

Reeder testified that if a child is already dehydrated and malnourished, then goes fifteen hours without food or drink, that could be enough to cause death, especially considering the child's size, age, and medical condition. Reeder opined that the direct cause of Ava's death was physical neglect—specifically, nutritional neglect, the restriction of food and water, with evidence of prior medical neglect due to lack of appropriate medical care and follow-up.

Reeder also gave an opinion after reviewing Dustin's records. According to Reeder, Dustin had also missed well-child appointments and had issues with weight gain. King and Mother were instructed to fortify Dustin's formula, just as with Ava. Two weeks later, at his two-month well-child checkup, King and Mother said that Dustin was vomiting when they increased his calories, so they stopped. The two-month well-child visit was the last time Dustin was seen by his pediatrician.

About a month before Ava's death, the children's grandfather took Dustin to the hospital because he had choked on a muffin. On the date of Ava's death, Dustin was taken to the emergency room because of the circumstances surrounding Ava's death. His weight that day was the same as it had been a month prior when he was seen in the emergency room. On the date of Ava's death, Dustin's weight placed him in the sixth percentile on weight growth charts. One year later, after Dustin had been removed from his parents, he was in the seventy-fourth percentile.

Reeder testified that Dustin's laboratory work caused concern regarding his electrolyte or mineral abnormalities, as well as concern for kidney injury due to dehydration and malnutrition. Reeder testified that Dustin's laboratory work showed symptoms of Refeeding Syndrome, the

12

necessity of reintroducing calories of food slowly after a period of malnutrition to avoid "shock[ing] the system" and causing symptoms such as a sudden drop in electrolyte levels, heart attacks, and other problems. Dustin remained in the hospital until May 8—about two weeks after Ava's death.

James Pace, King's best friend, testified that he visited King's house three times per week or more, and if they were not at King's house, King and his children were at Pace's house. Pace testified that King and Mother kept house like he would expect young parents to do.

Pace said that King kept fruits, vegetables, and protein in the home for Ava and Dustin. Pace said that King kept snacks like Goldfish and Capri Sun juice packs, and food like Hamburger Helper and fried chicken, also. Pace said King's children always had a sippy cup of juice, water, or milk. He further stated that King always had bottled water or tap water available, and drinks in the refrigerator. Pace said that he never saw King deny his children food or water. Pace further stated that King would interrupt his conversation to stop and get something for the children if they needed or wanted something.

Pace testified that Ava was verbal and would ask for things like crackers, juice, milk, or water. King's children had stayed at Pace's house before, and Pace said that Ava and Dustin never acted as if they were deprived of food or water.

Pace testified that he had previously discussed the children's weights with his wife and with King. Pace's wife, a certified nurse's aide, commented that Ava and Dustin were both small and would not gain weight like Pace's children would. King told Pace he did not understand why the children were underweight because Ava ate "like a horse," and King could

13

not keep food out of Dustin's mouth. Pace expressed surprise that the children were diagnosed as malnourished because of the number of times he saw them eating and drinking. Pace testified that he did not believe King did anything wrong in the care of his children.

Pace stated that he was at King's home the night before Ava's death, but King's children were already asleep. Pace had seen King's children the night before that, eating dinner and playing. He said that Ava appeared to be coming down with a cold. Pace said he never had any concerns that King neglected Ava or Dustin.

Pace was aware that King used cocaine in February 2023, and Pace said that he told King "he needed to make some adjustments." Pace was unaware whether King stopped using cocaine before Ava's death. Pace testified that King was an "utter wreck" after Ava's death, and he cried and prayed a lot and said he did not understand how that could happen

King's sister, Alice, testified that she often babysat Ava and Dustin several times a week while King worked. Ava and Alice's daughter were nine months apart in age. Alice kept the children each Thursday through Sunday from 1:00 or 2:00 p.m., and King would pick them up between 2:00 and 3:00 a.m., after getting off work. Other family members would also babysit Ava and Dustin, including King's father.

Alice last saw Ava when she babysat King's children two days before Ava's death. Ava was sick at that time, but she did not have symptoms of diarrhea or vomiting at Alice's home.

Alice relayed that four days before Ava's death, King was working, and King's father was babysitting Ava and Dustin. Alice testified that they had a family gathering during that visit

14

with a lot of food for everyone to eat, including smoked ribs, fruit trays, candy, cupcakes, beans, potato salad, watermelon, and strawberries.

Ava's and Dustin's maternal grandparents did not live in Wise County, and Alice said King's children visited them once per month. Alice testified that the children's maternal grandmother was a registered nurse, and King and Mother often asked her for advice.

Alice was not concerned about the state of King's home, considering he had two toddlers. She stated that most of the clutter was toys, blankets, snacks, and clothes. Alice testified that there was always food in King's home. Alice was at King's home about two weeks prior to Ava's death, and she saw food and water in the home. Alice said that King had a snack drawer in the refrigerator, and Ava could get her own food and drinks out. She said Ava would communicate when she was hungry or thirsty, and she had never seen anyone deny Ava food or water.

Alice testified that her youngest daughter and Ava had similar statures and the women in the King family were all small in size with high metabolisms. Alice testified that her children are small, but they "eat like crazy." Alice said that she believed her daughter and Ava weighed about the same even though her daughter was nine months older and was a little taller than Ava.

Alice testified as to several photographs of Ava and Dustin. One photograph shows Ava and Dustin with cupcake icing on their faces. Other photographs show Dustin with cake on his face eating Cheetos and muffins. Those photographs were taken between four and nine days before Ava's death.

Alice stated that King and Mother started having marital problems in December of 2022 and that things were not getting better or worse from February into April 2023. Alice said that Mother was "cheating on" King, "staying out all hours of the night," and using drugs. Alice said that she did not know about King's cocaine use in February, March, or April 2023. Alice also did not know Ava and Dustin were each diagnosed with poor weight gain. Alice stated that King had a large support system to help him care for Ava and Dustin, and if there had been any concerns or signs of abuse or neglect, the family would have intervened.

During Espinoza's testimony, numerous photographs of King's home were admitted into evidence. The photographs depict toys, blankets, shoes, and clothes almost completely covering the floor in the living room and bedrooms. The photographs show food and food trash including a full Welch's bottle and several sippy cups on a kitchen counter; an unopened case of bottled water and an additional, partially used case on the kitchen floor; packaged snacks, ramen noodles, cereals, instant mashed potatoes, and canned goods on some shelves in the kitchen; a jar of peanut butter and other packaged snacks on the floor next to the bed in the master bedroom; an Oreo snack-pack package on the living room floor; innumerable fast-food cups, wrappers, containers, and bags on the kitchen counter, the kitchen floor, and the floor of the master bedroom; and a package of muffins, plus a muffin out of the package, on the bed next to Ava's body.

The photographs also show at least a half-dozen soiled diapers on a dresser and on the floor in Dustin's room; an overflowing diaper disposal container in the master bedroom; and soiled diapers next to the bed and the bathroom trashcan in the master bedroom. There were

16

photographs of feces on the wall next to and on Ava's bed. There was a clothes hamper piled high in the master bedroom and three more hampers full-to-overflowing in the hallway between Ava's room and the kitchen, two of which blocked the hallway. A baby gate was erected between the kitchen and the living room. The refrigerator had no handles on either the refrigerator or freezer section.

## III. Legally Sufficient Evidence Supports King's Conviction

In his sole point of error, King argues that the evidence at trial was insufficient to establish that he knowingly intended to cause Ava's injury through omission or that he "knowingly withheld food and water knowing that it was reasonably certain to result in serious bodily injury or in [Ava's] death."

In the context of knowingly causing injury to a child by omission, "the State's burden [is] to show that Appellant had a statutory duty to act, he failed to act, and in failing to act, he . . . knew serious bodily injury would be caused, but he still failed to act." *Cockrell v. State*, 721 S.W.3d 448, 454 (Tex. Crim. App. 2025) (citing TEX. PENAL CODE ANN. § 22.04). "Stated another way, 'knowingly' causing the child's injury requires evidence that the defendant was aware with reasonable certainty that the result of serious bodily injury . . . would have been prevented had the defendant performed the act that was omitted." *Proo v. State*, 587 S.W.3d 789, 810 (Tex. App.—San Antonio 2019, pet. ref'd).

Injury to a child is "a result-oriented offense." *Cockrell*, 721 S.W.3d at 454 (quoting *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007)). "[P]roving a violation of [Section 22.04(b), then,] requires evidence that the accused possessed a mental state that relates

17

to '*the result* of that conduct[,]' rather than simply to the conduct itself (or in this case, the lack of conduct)." *Id.* (third alteration in original) (quoting *Williams*, 235 S.W.3d at 750).

The jury charge tracked the language of the indictment and required that the State prove that King "by omission, knowingly cause[d] serious bodily injury to [Ava], . . . by failing to provide adequate food or water."[4] The State had to prove, then, that King knew that failing to provide adequate food and water to Ava would cause her serious bodily injury.

We first note that King's point of error is framed in terms that would hold the State to a higher evidentiary burden than was required under the facts presented. Regarding the meaning of "serious bodily injury," the jury charge tracked the language of the indictment, and further, used the statutory definition of "serious bodily injury."[5] Yet, King's point of error includes language indicating that the State had to show that he "knowingly withheld food and water knowing that it was reasonably certain to result in serious bodily injury *or in his daughter's death*," and much of his argument focuses on an alleged lack of evidence that King knowingly caused Ava's *death*. (Emphasis added). Although "[s]erious bodily injury" includes bodily injury that causes death, it also includes bodily injury that creates only "a substantial risk of death" or causes "serious permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ." TEX. PENAL CODE ANN. § 1.07(a)(46).

---

[4]Per Section 22.04(b)(1), the indictment and charge also alleged that King had a statutory duty to act. *See* TEX. PENAL CODE ANN. § 22.04(b)(1) (Supp.). King does not deny that he had a statutory duty to provide for his daughter. *See* TEX. FAM. CODE ANN. § 151.001(a)(3) (Supp.).

[5]The jury charge defined "serious bodily injury" as Section 1.07(a)(46) of the Texas Penal Code does. *See* TEX. PENAL CODE ANN. § 1.07(a)(46) (Supp.). King has not raised any charge error on appeal.

18

This differentiation is important because King argues that Lenfest's testimony—specifically, his response of "I don't think so" when questioned whether Ava's illness was clearly sufficient to cause her death and whether the malnutrition and dehydration were clearly insufficient to do so—was insufficient to support the jury's verdict. In this limited portion of Lenfest's testimony, he was questioned as to whether the results of King's actions were sufficient to cause Ava's *death*—he was not questioned about whether King's actions were sufficient to cause Ava's *serious bodily injury*. Because the indictment and the jury charge charged King with causing serious bodily injury, not death, his arguments that the evidence was insufficient to show that he knowingly caused Ava's death, and specifically his arguments regarding the excerpt from Lenfest's testimony, miss the mark. *See Johnson*, 364 S.W.3d at 294.

We turn then to the evidence supporting the State's burden as determined by the indictment and the jury charge.

To the extent that King claims the State failed to prove that King's omission of water or food resulted in serious bodily injury to Ava, the State suggests that the evidence of Ava's malnourishment and dehydration was sufficient to establish the element of serious bodily injury, and we agree. Lenfest testified that Ava had an acute kidney injury, severe dehydration, and that her cause of death was due to "[c]omplications of neglect, including malnutrition and hypernatremic dehydration." On cross-examination, Lenfest explained that hypernatremic dehydration did not "necessarily mean malnutrition," but it could be caused by a number of circumstances, including a lack of fluid intake. He said he thought Ava was dehydrated as a result of malnutrition. Lenfest also acknowledged that Ava had "fecal material in her small and

19

large intestines," and although that indicated she was receiving "some nutrition, . . . the end result [was] that it [was not] enough nutrition." Based on Lenfest's medical testimony, the jury could find that malnutrition and hypernatremic dehydration qualified as "serious bodily injury." *See Proo*, 587 S.W.3d at 811.

King's challenge to the sufficiency of the evidence to support his conviction centers on an alleged paucity of evidence demonstrating his knowing mental state. King challenges the sufficiency of the evidence to show that he was aware with reasonable certainty that serious bodily injury would result from his failure to provide food or water to Ava.

"Mental state is rarely proved through direct evidence and almost always depends on circumstantial evidence." *Dorch v. State*, 596 S.W.3d 871, 885 (Tex. App.—San Antonio 2019, pet. ref'd) (citing *Hart v. State*, 89 S.W.3d 61, 64 (Tex. Crim. App. 2002)). "Each fact need not point directly and independently to the guilt of the appellant, as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction." *Id.* (quoting *Thomas v. State*, 444 S.W.3d 4, 8 (Tex. Crim. App. 2014)). "Knowledge . . . may be inferred from any facts which tend to prove [its] existence, 'including the acts, words, and conduct of the accused, [] the method of committing the crime[,] and . . . the nature of wounds inflicted on the victim[]." *Id.* (third alteration in original) (quoting *Hart*, 89 S.W.3d at 64).

Reeder testified that Ava lost weight during her first year of life and that her parents were instructed to take additional measures to help her gain weight. Reeder noted that Mother stopped attending the well-child visits after Ava's six-month visit, and King brought Ava in by himself. After Ava's twelve-month well-child visit, which she came in for when she was seventeen

20

months old, King did not bring her in again. Ava missed her eighteen-month and twenty-four-month well-child visits. At one of the three pediatrician appointments King took Ava to after her six-month well-child visit, Ava had lost weight, and at another, she was notably thin for her age and had poor weight gain. At all three, King was instructed to take measures to increase Ava's caloric intake. Yet, according to Reeder, Ava was three pounds underweight—weighing just twenty-one pounds at the time of her death—eleven months after her last well-child visit.

Regarding Ava's dehydration, Reeder testified that

> our thirst mechanism is one of the strongest reflexes that we have, meaning that if we are starved to the point or dehydrated to a certain point, our thirst mechanism will kick in, and we will do anything that we can to try to get liquid or try to rehydrate ourselves, do things that we would never think of doing: drinking out of a toilet, drinking ocean water even though we know [that is] bad for us.

Reeder testified that "it is extremely rare for a person who otherwise has access to liquids or fluids to get themselves to a point of hypernatremic dehydration, especially to a fatal state in a person who otherwise has the ability to get to liquids or fluids." Reeder said that a crib a child could not get out of would be a "barrier" that would keep the child from being able to hydrate herself. Espinoza testified that Ava could not get out of the crib on her own.

Reeder further testified that Ava would have been hungry, thirsty, very weak, and very fussy or irritable in the hours before her death. Reeder stated that fifteen hours of uninterrupted sleep was several hours more than what is common for a twenty-eight-month-old child. Reeder testified that Ava's abnormal appearance in the last several days of her life would have prompted a reasonable caregiver to provide medical treatment, food, or water. Reeder opined that Ava's direct result of death was "[p]hysical neglect with restriction of food and water causing the

21

hypernatremic dehydration and then evidence of prior medical neglect . . . due to the lack of appropriate medical care and follow up."

That medical testimony not only established Ava's symptoms near the end of her life and how they would have alerted a reasonable caregiver to provide for her; it also showed that King and Mother had not provided Ava with sufficient nutrition at earlier times in her life. In particular, because King attended Ava's last three pediatrician appointments by himself, he alone received the instructions to increase Ava's caloric intake through increasing the concentration and amount of her formula and adding PediaSure to her diet.

Further, testimony from several witnesses indicated that King kept water, other beverages, and snack foods in the house. There was also testimony that King had a snack drawer in the refrigerator and that Ava could access it. Yet photographs of the kitchen show that the handles on both the refrigerator and the freezer sections of the refrigerator were missing. And while the photographs show cases of water on the floor, and a large bottle of juice and several sippy cups on the kitchen counter, there was no testimony indicating Ava could reach or open any of those containers herself. Testimony established that Ava could not get out of her crib, and, had she been able to, baskets of laundry in the hall and a baby gate in the kitchen would have kept her from being able to reach King, the only adult available to provide her with food or water, had she been strong enough to ask for it.

Finally, the evidence establishes that King started using cocaine in February 2023, before Ava's death in April, and he was the sole caregiver much of the time because Mother was often absent. While there was no evidence that King was using cocaine on the date of Ava's death, the

evidence is undisputed that he left her in her crib for over fifteen hours, and when he found her, she was dead, with medical evidence that she had died of malnutrition and dehydration.

King claims that because "injuries caused by failure to provide nourishment . . . occur over a period of time," the evidence is insufficient because there is no proof that Ava went without food or water other than the fifteen-hour period before her death. At one point, Reeder testified that fifteen hours without water would be insufficient to cause Ava's death. But Reeder later testified that "in a child like [Ava] who may be severely malnourished and already having a degree of dehydration, [fifteen] hours without anything, without any fluids, yes, may be enough to cause death."

Considering all the evidence, presuming that the jury resolved any conflicting inferences in favor of the verdict, and deferring to the jury's determinations as to the weight and credibility of the evidence, as we must, *see Braughton*, 569 S.W.3d at 608, we conclude the evidence here supports a reasonable inference that King was aware of Ava's malnourished and dehydrated condition and that his failure to provide her with sufficient food or water was reasonably certain to cause her serious bodily injury. *See Dorch*, 596 S.W.3d at 886; *Proo*, 587 S.W.3d at 809–11.

We overrule King's sole point of error.

23

## IV. Conclusion

We affirm the trial court's judgment.

Jeff Rambin
Justice

Date Submitted:    January 23, 2026
Date Decided:    March 11, 2026

Do Not Publish